# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *People v. Stanford*, 2011 IL App (2d) 090420

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. CEVIN Y. STANFORD, Defendant-Appellant. |
| District & No. | Second District<br>Docket No. 2–09–0420 |
| Filed | June 16, 2011 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant failed to establish that he was denied effective assistance of counsel, regardless of his claim that the trial court denied his motion to replace his public defender when there was "complete dysfunction in the attorney-client relationship," and the appellate court also rejected his contention that the trial court abused its discretion by not conducting a further inquiry, but defendant's multiple sentences were reimposed to reflect the proper application of the mandatory consecutive sentencing provision in section 5–8–4 of the Unified Code of Corrections–attempted first-degree murder, aggravated battery with a firearm, and armed violence. |
| Decision Under Review | Appeal from the Circuit Court of Kane County, No. 06–CF–1712; the Hon. Grant S. Wegner, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; sentences reimposed as modified. |

| Counsel on Appeal | Thomas A. Lilien and Kathleen Weck, both of State Appellate Defender's Office, of Elgin, for appellant. |
|---|---|
| | John A. Barsanti, State's Attorney, of St. Charles (Lawrence M. Bauer and Victoria E. Jozef, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE ZENOFF delivered the judgment of the court, with opinion. Justices Bowman and Burke concurred in the judgment and opinion. |

**OPINION**

¶ 1        Following a bench trial, defendant, Cevin Y. Stanford, was convicted of three counts of attempted first-degree murder (720 ILCS 5/8–4(a), 9–1(a)(1) (West 2006)), five counts of aggravated battery with a firearm (720 ILCS 5/12–4.2(a)(1) (West 2006)), and eight counts of armed violence (720 ILCS 5/33A–2(a), (b) (West 2006)). He was sentenced to an aggregate prison term of 72 years. On appeal, defendant argues that he was denied his right to effective assistance of counsel and that two of his convictions and sentences violated the one-act, one-crime rule. Following the filing of briefs, the State filed a motion to cite additional authority (*People v. Miller*, 238 Ill. 2d 161 (2010)), which we granted. The State also filed a motion to vacate the sentences as void based on the trial court's alleged failure to enter the sentences in conformity with section 5–8–4 of the Unified Code of Corrections (730 ILCS 5/5–8–4(a)(I) (West 2006)). We took with the case the State's motion to vacate and ordered the parties to submit supplemental briefs on the applicability of *Miller* and on the argument raised in the State's motion to vacate. For the reasons that follow, we affirm in part and vacate in part, and reimpose defendant's sentences as modified.

¶ 2                                BACKGROUND
¶ 3        On July 26, 2006, a grand jury indicted defendant on 3 counts of attempted first-degree murder (counts I through III) (720 ILCS 5/8–4(a), 9–1(a)(1) (West 2006)), 5 counts of aggravated battery with a firearm (counts IV through VIII) (720 ILCS 5/12–4.2(a)(1) (West 2006)), and 12 counts of armed violence (counts IX through XX) (720 ILCS 5/33A–2(a), (b), (c) (West 2006)). The charges stemmed from an incident that occurred on the evening of July 4, 2006, during which two persons shot at five young men on a porch in Aurora, Illinois, and injured three of them: Matthew Pruneda (who was shot in the face and both ankles), Samuel Silva (who was shot in the leg), and Jaime Diaz (who sustained a graze wound to the abdomen). The State later dismissed four of the armed-violence counts (counts IX, X, XI, and XVIII) (720 ILCS 5/33A–2(c) (West 2006)). The State also later struck certain

-2-

sentencing enhancements alleged in the attempted-first-degree-murder charges in counts I through III, leaving only an enhancement for personally discharging a firearm (720 ILCS 5/8–4(c)(1)(C) (West 2006)).

¶ 4    Codefendant, Michael Smith (defendant's cousin), was similarly indicted, but pleaded guilty and testified against defendant in exchange for a sentence of 12 years' imprisonment. As part of his plea, Smith also agreed to testify in an unrelated murder case.

¶ 5    The trial court appointed counsel for defendant from the Kane County public defender's office. However, defendant filed several *pro se* pretrial motions, including a motion to "replace public defender." In that motion, defendant asserted that he and his appointed counsel were "not seeing eye to eye" and were "not on the same level" and listed several alleged shortcomings of his attorney. The trial court then appointed the multiple defendants division (MDD) of the Kane County public defender's office only to review the motion. On April 11, 2008, MDD counsel reported to the court that he spoke with defendant and there was no "reason to believe that [appointed counsel] at this point has done anything that would render him ineffective." The court discharged MDD counsel (implicitly denying defendant's motion). After a recess, defendant's appointed counsel addressed the court:

> "I know you addressed other matters relating to [defendant's] motions, but at least in my little world there is still the relationship, if you will, between attorney and client which I respectfully represent to you is basically nonexistent. I know that [defendant] probably doesn't trust a single thing I do or say, and I think that that's still an element that's before this Court."

The court responded addressing defendant, "Well, I can tell you, [defendant], [appointed counsel] has been around a long time. He's an excellent lawyer. He's the guy you want out there for you. So I understand there may be some issues, but again, with [appointed counsel's] experience I'm sure that can be worked through."

¶ 6    On April 14, 2008, defendant's case proceeded to a bench trial. On April 25, 2008, the trial court found defendant guilty of all of the 16 counts remaining in the indictment and made a specific finding that the State proved beyond a reasonable doubt as to each count that defendant personally discharged a firearm.

¶ 7    Though still represented by counsel, on June 18, 2008, defendant filed a *pro se* motion for a new trial, which included an allegation that the trial court abused its discretion in denying his *pro se* motion to replace the public defender. In addition to listing appointed counsel's alleged failures at trial, defendant highlighted appointed counsel's admission (according to defendant) that there was "absolutely no communication" between them. On July 1, 2008, the trial court again appointed MDD counsel to review defendant's claims. On August 29, 2008, MDD counsel reported that the motion contained allegations regarding trial strategy as well as issues that could be adopted or rejected by appointed counsel in the "actual new trial motion" but that nothing alleged in the motion rose to the level of ineffective assistance of counsel. The trial court then inquired if defendant had anything to say. Defendant replied, "There's been no communication between me and [appointed counsel]. I put a motion myself with the Attorney Registration Board, and [appointed counsel] never come [*sic*] and talked to me, he never even sent an investigator out ***."

Defendant continued asserting counsel's shortcomings during trial, stating that counsel made "no effort." Defendant concluded, "He just got mad at me because I told him I didn't like what he was doing, and he never addresses [*sic*] what I wanted him to address." The trial court denied defendant's *pro se* motion and discharged MDD counsel. On October 3, 2008, appointed counsel filed a motion for a new trial. On November 14, 2008, the trial court heard argument on the motion, denied it, and commenced the sentencing hearing.

¶ 8        On November 21, 2008, the trial court sentenced defendant. With respect to the counts based on shooting Matthew Pruneda in the face, the court found that count IV, aggravated battery with a firearm, merged into count XII, armed violence (personal discharge of category I or II firearm). The court next found that count XV, armed violence (armed with dangerous weapon), based on shooting Pruneda in the face, also merged into count XII. The court then found that counts IV, XII, and XV merged into count I, attempted murder based on intent to kill Pruneda. The court concluded that the sentence for count I was 26 years' imprisonment, which included a 20-year add-on.

¶ 9        With respect to the counts based on shooting Pruneda in the left ankle, the court found that count V, aggravated battery with a firearm, merged into count XIII, armed violence (personal discharge of category I or II firearm). The court further found that count XVI, armed violence (armed with dangerous weapon), based on shooting Pruneda in the left ankle, also merged into count XIII. The court concluded that the sentence for count XIII was 20 years' imprisonment.

¶ 10        Regarding the shooting of Pruneda's right ankle, the court found that count VI, aggravated battery with a firearm, merged into count XIV, armed violence (personal discharge of category I or II firearm). The court also found that count XVII, armed violence (armed with dangerous weapon), for the same conduct, merged into count XIV. The court concluded that the sentence for count XIV was 20 years' imprisonment.

¶ 11        With respect to the shooting of Samuel Silva in the leg, the court found that count VII, aggravated battery, merged into count XIX, armed violence (personal discharge of category I or II firearm). The court further found that count XX, armed violence (armed with dangerous weapon), for the same conduct, also merged into count XIX. The court next found that counts VII, XIX, and XX merged into count II, the attempted first-degree murder of Silva, and determined that the sentence for count II was 26 years' imprisonment, including a 20-year add-on.

¶ 12        Regarding the shooting of Jaime Diaz, the court found that count VIII, aggravated battery with a firearm, merged into count III, the attempted first-degree murder of Diaz. The court concluded that the sentence for count III was 26 years' imprisonment, including a 20-year add-on.

¶ 13        The court next found that the injuries to Pruneda's face (counts I, IV, XII, and XV) and left ankle (counts V, XIII, and XVI) constituted severe bodily injury. The court also found that the injury to Silva's leg (counts II, VII, XIX, and XX) was severe bodily injury. The court then found that the injury to Pruneda's right ankle (counts VI, XIV, and XVII) and to Diaz's stomach (counts III and VIII) were not severe bodily injury. The court decided that the 26-year sentence on count I (attempted first-degree murder of Pruneda) would run

consecutively to the 20-year sentence on count XIII (armed violence, based on shooting Pruneda's left ankle) and that those two sentences would run consecutively to the 26-year sentence on count II (attempted first-degree murder of Silva). The court then decided that the 20-year sentence on count XIV (armed violence, based on shooting Pruneda's right ankle) would run concurrently with the sentence on count I and that the 26-year sentence on count III (attempted first-degree murder of Diaz) would run concurrently with the sentence on count I as well.

¶ 14 Also on November 21, 2008, due to appointed counsel's upcoming surgery, the trial court granted his request for an extension of time until January 23, 2009, to file a postjudgment motion, with the hearing set for January 30.

¶ 15 In the meantime, defendant filed a *pro se* motion to reduce his sentences on December 17, 2008, and a notice of appeal on December 24, 2008. On January 8, 2009, defendant agreed to withdraw his premature notice of appeal. On January 8 and 30, 2009, the court entered orders setting the hearing on any postjudgment motion for February 6, 2009.

¶ 16 On February 6, 2009, appointed counsel was not in court, but the public defender himself appeared in his place and requested an additional 30 days to file a postjudgment motion. The court granted the request, extending the deadline for filing to March 9 and setting the hearing on the motion for March 13. On March 13, appointed counsel appeared and the court asked him what time frame he needed to file the appropriate motions. Counsel replied that it was "really up to the court" and that he was back in the office part time. The court extended the deadline for filing to April 10 with the hearing set for April 17. Appointed counsel filed a motion to reconsider the sentences on April 13.

¶ 17 On April 17, 2009, appointed counsel declined to adopt defendant's *pro se* motion to reduce the sentences. The court heard argument from appointed counsel on his motion to reconsider the sentences and then, over the State's objection, from defendant on his *pro se* motion to reduce the sentences. The same day the trial court denied both motions and appointed counsel filed defendant's notice of appeal. Following briefing, the State filed a motion to cite additional authority (*People v. Miller*, 238 Ill. 2d 161 (2010)) and a motion to vacate the sentences as void based on section 5–8–4 of the Unified Code of Corrections (730 ILCS 5/5–8–4(a)(i) (West 2006)). We granted the motion to cite additional authority and took the motion to vacate with the case. We also ordered supplemental briefing on the applicability of *Miller* and on the State's argument in the motion to vacate.

¶ 18            ANALYSIS

¶ 19 Before addressing the merits, we must first ascertain our jurisdiction over this appeal. Pursuant to Illinois Supreme Court Rule 606(b) (eff. Mar. 20, 2009), to confer jurisdiction on this court, a defendant must file a notice of appeal "within 30 days after the entry of the final judgment appealed from or if a motion directed against the judgment is timely filed, within 30 days after the entry of the order disposing of the motion." To be timely, a motion directed against the judgment of sentence must be filed within 30 days of entry of the judgment. See *People v. Flowers*, 208 Ill. 2d 291, 303 (2003) ("Normally, the authority of a trial court to alter a sentence terminates after 30 days."); see also Ill. S. Ct. R. 605(a)(3)(B)

(eff. Oct. 1, 2001) (trial court must advise a defendant that, prior to an appeal, any challenge to the sentence must be made in a written motion filed within 30 days of sentencing).

¶ 20    Here, the trial court's final judgment was entered on November 21, 2008, when it sentenced defendant. See *People v. Danenberger*, 364 Ill. App. 3d 936, 939 (2006) (final judgment is entered in a criminal case when the defendant is sentenced). Thus, defendant had until December 22, 2008,[1] to file his notice of appeal or a motion directed against the judgment. Defendant filed a timely *pro se* postjudgment motion on December 17, 2008, while he was still represented by appointed counsel. The State maintains, and we agree, that defendant had no authority to file a *pro se* motion while he was represented by counsel and that the trial court should not have entertained it. See *People v. Serio*, 357 Ill. App. 3d 806, 815 (2005) (stating that a defendant represented by counsel has no authority to file a *pro se* motion and the court should not consider it). However, our research reveals, and the State offers, no authority in support of its proposition that the *pro se* motion, though unauthorized, could not operate to toll the time for filing the notice of appeal. Rule 606(b)'s requirements for tolling the time–the filing of a timely motion directed against the judgment–were satisfied by defendant's timely *pro se* motion to reduce his sentences.

¶ 21    Moreover, the unusual circumstances of this case compel the conclusion that defendant's notice of appeal, filed the same day the trial court heard and denied both defendant's *pro se* motion to reduce his sentences and appointed counsel's motion to reconsider the sentences, conferred jurisdiction on this court. We find instructive *People v. Williams*, 59 Ill. 2d 243 (1974), and *People v. Easley*, 199 Ill. App. 3d 179 (1990). In *Williams*, the defendant was convicted following a bench trial during which he was assisted by appointed counsel. After sentencing, the trial court advised the defendant of his right to appeal but did not advise him of the 30-day limit within which he had to act. About five months later, the defendant filed a *pro se* motion seeking a transcript of his trial. The trial court appointed the public defender, who filed a notice of appeal about three months after that. Over the next three years, the parties briefed and orally argued the case, which was ultimately dismissed by the appellate court for failure to comply with the timeliness requirements of Rule 606. *Williams*, 59 Ill. 2d at 244.

¶ 22    Our supreme court allowed the defendant's petition for leave to appeal and held that the appellate court had abused its discretion in dismissing the appeal. *Williams*, 59 Ill. 2d at 246. The supreme court relied on *People v. Brown*, 54 Ill. 2d 25 (1973), in which it held, under similar facts, that the appellate court had abused its discretion in dismissing an appeal on its own motion where the case had already been briefed and argued and the defendant's *pro se* notice of appeal was untimely but still within the six months prescribed in Illinois Supreme Court Rule 606(c) (eff. Mar. 20, 2009), which provides for late notices of appeal. *Williams*, 59 Ill. 2d at 245-46; see Ill. S. Ct. R. 606(c) (eff. Mar. 20, 2009) (providing for extensions of time of up to six months for filing a notice of appeal when a defendant files a motion requesting an extension and showing a reasonable excuse or lack of culpable negligence for the tardiness). The court in *Williams* found *Brown* dispositive, especially because the

---

[1]December 21, 2008, the thirtieth day, was a Sunday.

defendant in neither case had been advised of the timeliness requirements of Rule 606(b). *Williams*, 59 Ill. 2d at 246. The court reasoned that the defendant's *pro se* notice of appeal evinced his intent to file an appeal and that Rule 606(c) operated to save the appeal, despite the failure of the defendants in both *Brown* and *Williams* to file motions for leave to file a late notice of appeal as required by Rule 606(c). *Williams*, 59 Ill. 2d at 246.

¶ 23    In *Easley*, the appellate court relied on *Williams* and concluded that the defendant's late notice of appeal was nonetheless timely because the defendant was likely lulled into believing that he had additional time to file it. *Easley*, 199 Ill. App. 3d at 184. The defendant in *Easley* pleaded guilty and was sentenced, and the trial court advised him of his right to appeal and of the timeliness requirements for doing so. The defendant filed a *pro se* motion to reduce his sentence five days late and the trial court struck it as untimely. Two weeks later, the defendant sent to the trial court a letter explaining his excuse for not filing the motion sooner. The trial court treated the letter as a motion to reconsider its order striking the motion. The court heard the motion and denied it. Twenty days later, the defendant filed his notice of appeal. *Easley*, 199 Ill. App. 3d at 181.

¶ 24    The appellate court held that the defendant's motion to reduce his sentence was timely filed, based on the proof of service. *Easley*, 199 Ill. App. 3d at 182-83. The court, however, concluded that the time for filing the notice of appeal began to run on the day the trial court struck the motion to reduce the sentence and that the time was not tolled by the motion to reconsider the order striking the motion. *Easley*, 199 Ill. App. 3d at 183-84. Noting that these facts would normally require dismissal of the appeal, the court nonetheless held that the notice of appeal was timely. *Easley*, 199 Ill. App. 3d at 184. The court concluded, by analogy to *Brown* and *Williams*, that the defendant had clearly evinced his intent to appeal. *Easley*, 199 Ill. App. 3d at 184. The court reasoned that, although the trial court had advised the defendant of the appeal process at sentencing, it did not admonish him as to the timing requirements for an appeal when it struck his motion to reduce his sentence. *Easley*, 199 Ill. App. 3d at 184. Given that the trial court treated the defendant's letter as a motion to reconsider, the appellate court held that the "defendant was likely lulled into believing he did not have to file [a] notice of appeal until the motion to reconsider was ruled upon." *Easley*, 199 Ill. App. 3d at 184. Thus, the court vacated the order striking the motion to reduce the sentence and remanded for a hearing on that motion. *Easley*, 199 Ill. App. 3d at 185.

¶ 25    As in *Williams* and *Easley*, defendant here clearly evinced his intent to appeal by filing *pro se* his motion to reduce the sentences and his notice of appeal. Because defendant was represented by counsel, he had no authority to file a *pro se* motion. However, as discussed above, defendant's *pro se* motion was a timely motion directed against the judgment, as required by Rule 606(b) to toll the time for filing a notice of appeal. Moreover, although defendant was still represented by appointed counsel, the record reveals that trial counsel was preoccupied with his own surgery and recovery. This circumstance leads us to the conclusion that defendant's acting *pro se* was not unreasonable. See *Williams*, 59 Ill. 2d at 245 (where the defendant's trial counsel was preoccupied with his own indictment in federal court, as indicated in an affidavit, the attorney's " 'psychological state was not conducive to complying with the Illinois Supreme Court Rules regarding Notice of Appeal' ").

¶ 26    Furthermore, the circumstances in the instant case were such that defendant reasonably

believed that his *pro se* motion tolled the time for filing a notice of appeal. At a status hearing on January 8, 2009, the following colloquy occurred:

"THE COURT: [Defendant], you filed some pleadings in this case that have created some confusion that we need to address. One of them is that you filed a motion asking that I give you an opportunity to take an appeal. Now, you have that opportunity already. We've talked about that and what it takes to proceed on that appeal in the past. The problem when you file a motion like that is that even though you filed that, the motion to reduce sentence is what you have to do first and I have to rule on that before you get your appeal.

Once you file that other *pro se* motion, the Circuit Clerk's Office treats that as if it's on appeal, so now they're requiring the court reporters to prepare transcripts and things of that sort, so it's premature, way too early for that to happen. What has to happen is we have to have a hearing on your motion to reduce sentence before you can do that. Do you understand that?

DEFENDANT: Yes, I understand.

THE COURT: All right. So at this point in time you have the right to take an appeal, there's no question about that. We just have to get through the motion to reduce sentence before we get to that. Do you understand that?

DEFENDANT: Yes.

THE COURT: So you have no objection then to withdrawing your motion as it relates to asking for an appeal, do you?

DEFENDANT: No, I don't have no [*sic*] objection.

MS. CONANT [assistant public defender appearing on behalf of appointed counsel]: Judge, I did speak to him about this in the back and he was in agreement with that.

THE COURT: And then I can set the motion to reduce sentence for February 6th.

MS. CONANT: Judge, I've talked to him about that, too. He wanted his own motion filed in the court, but he is willing to wait for [appointed counsel] to come back so he and [appointed counsel] can address that. I know that [appointed counsel] got additional time to file that so he can do it when he returned.

THE COURT: All right. And we'll use February 6th still as a touchstone. If you find out you and [appointed counsel] want more time, we'll do that and I'll figure out another time we'll come back before me, but we'll figure something out."

This record reveals that, not only was defendant lulled into believing that his *pro se* motion tolled the time for filing his notice of appeal, he was actually assured that this was the case. Defendant agreed to withdraw his *pro se* notice of appeal after the trial court told him, "[Y]ou have the right to take an appeal, there's no question about that. We just have to get through the motion to reduce sentence before we get to that." Based on *Williams* and *Easley*, under the unusual circumstances of this case, defendant's notice of appeal, filed the day the trial court denied his *pro se* motion to reduce his sentences, was timely and conferred jurisdiction on this court.

¶ 27     Having determined our jurisdiction over this appeal, we now turn to the merits.

Defendant argues that, because the trial court denied his motion to replace the public defender when there was "complete dysfunction in the attorney-client relationship," he was constructively denied his right to effective assistance of counsel. The sixth and fourteenth amendments to the United States Constitution provide that a defendant has the right to effective assistance of counsel. *People v. Angarola*, 387 Ill. App. 3d 732, 735 (2009). Normally, whether a defendant was denied the right to effective assistance of counsel is determined in accordance with the familiar two-prong test established in *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). *Angarola*, 387 Ill. App. 3d at 735. "[U]nder the *Strickland* test, a defendant must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) the deficient performance so prejudiced the defense as to deny the defendant a fair trial." *Angarola*, 387 Ill. App. 3d at 735 (citing *Strickland*, 466 U.S. at 687). However, our supreme court has noted that the Court in *Strickland* recognized that "there are some circumstances so likely to prejudice the accused that such prejudice need not be shown, but instead will be presumed." *People v. Hattery*, 109 Ill. 2d 449, 461 (1985). Situations warranting the presumption of prejudice include cases in which (1) there is a complete denial of counsel at a critical stage of the trial, or (2) "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *United States v. Cronic*, 466 U.S. 648, 659 (1984); see *Angarola*, 387 Ill. App. 3d at 735. Additionally, a more limited presumption of prejudice exists where counsel has a genuine conflict of interest. *Strickland*, 466 U.S. at 692. "Even so, the rule is not quite the *per se* rule of prejudice that exists for the Sixth Amendment claims mentioned above. Prejudice is presumed only if the defendant demonstrates that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected his lawyer's performance.' " *Strickland*, 466 U.S. at 692 (quoting *Cuyler v. Sullivan*, 446 U.S. 335, 350, 348 (1980)). Our supreme court has emphasized that a "defendant faces a high burden before he can forsake the two-part *Strickland* test" by meeting the *Cronic* standard. *People v. Johnson*, 128 Ill. 2d 253, 270 (1989).

¶ 28 Defendant fails to meet the *Cronic* standard because he argues neither a complete denial of counsel at a critical stage of the trial nor a failure to subject the State's case to meaningful adversarial testing. Indeed, defendant acknowledges that appointed counsel "may have effectively cross-examined the State's witnesses and advocated on his client's behalf to the best of his abilities." Yet, defendant argues that he was constructively deprived of effective representation because "communication between [defendant] and [appointed counsel] had eroded to the point where they were engaged in an irreconcilable conflict." Therefore, we consider whether defendant has established the more limited presumption of prejudice based on actual conflict of interest.

¶ 29 Defendant does not argue that appointed counsel had an actual conflict of interest based on a commitment to someone else, such as that contemplated by *Strickland*. See *Strickland*, 466 U.S. at 692 (stating that prejudice is presumed where a defendant's counsel was actively representing conflicting interests that adversely affected his performance). Instead, defendant argues that he and his counsel were embroiled in an "irreconcilable conflict." In defendant's motion to replace the public defender, the only assertions related to this conflict were that defendant and appointed counsel did not "see eye to eye" and were not "on the same level."

Neither in the motion nor on appeal has defendant even remotely suggested any basis for the alleged irreconcilable conflict other than disagreement over trial strategy. Disagreement over trial strategy between a defendant and his counsel does not result in a denial of effective counsel. See *People v. Royark*, 215 Ill. App. 3d 255, 266-67 (1991) (distinguishing a *per se* conflict of interest where counsel's conflict arises from a commitment to others from mere "bickering" between a defendant and his counsel and concluding that the defendant simply disagreed with his counsel about tactics). Accordingly, defendant has failed to demonstrate the limited presumption of prejudice. See *Cronic*, 466 U.S. at 658 ("[T]he right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial. Absent some effect of challenged conduct on the reliability of the trial process, the Sixth Amendment guarantee is generally not implicated.").

¶ 30 Nonetheless, defendant urges that the *Cronic* standard is met when a "defendant has completely lost trust in his attorney, or a serious breakdown in communication exists between attorney and client." In support, he cites case law from other jurisdictions. Even if we were to accept defendant's invitation to consider the cases he cites, we determine that they are inapposite. See *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 778-79 (9th Cir. 2001) (holding that the defendant completely lost trust in his attorney with legitimate reason where the attorney threatened the defendant that he would " 'sink him for 105 years' " and testify against him; called the defendant a liar; and openly opposed the defendant's motions for substitution); *United States v. Nguyen*, 262 F.3d 998, 1003-04 (9th Cir. 2001) (where the defendant's counsel of choice appeared and requested leave to be substituted in for the public defender and requested a continuance and the trial court made no inquiry into the defendant's dissatisfaction with appointed counsel, the trial court abused its discretion in denying the substitution motion); *Hale v. Gibson*, 227 F.3d 1298, 1313 (10th Cir. 2000) (holding that the attorney's performance was deficient, but that the defendant was not prejudiced, where the attorney admitted his animosity toward the defendant because of his suspicion that the defendant had broken into his office); *Brown v. Craven*, 424 F.2d 1166, 1170 (9th Cir. 1970) (holding that the defendant's being embroiled in an irreconcilable conflict with his attorney warranted reversal where the defendant was dissatisfied and would not cooperate with the attorney and the trial court summarily dismissed the defendant's four motions for new counsel without any inquiry). In those cases, the defendants either articulated extreme, and therefore legitimate, reasons for conflicts with their attorneys (*Adelzo-Gonzalez* and *Hale*) or the trial court summarily dismissed the defendants' motions for new counsel without any inquiry (*Nguyen* and *Brown*). In contrast, here, defendant offered no explanation of his irreconcilable conflict with appointed counsel other than disagreement over trial strategy. Moreover, the trial court here did not summarily dismiss defendant's motion to replace the public defender; rather, the court denied the motion only after appointing and hearing from MDD counsel.

¶ 31 Because no presumption of prejudice applies, we must determine whether defendant has met the two-prong *Strickland* test. See *Johnson*, 128 Ill. 2d at 271. Defendant does not even attempt to show, under the second prong, that he was prejudiced by appointed counsel's alleged failures. Accordingly, defendant has failed to demonstrate that he was denied the

right to effective assistance of counsel, constructively or otherwise. See *Strickland*, 466 U.S. at 697 (as defendant bears the burden of proof under both prongs, failure to satisfy one defeats the claim); *People v. Richardson*, 189 Ill. 2d 401, 411 (2000) (same).

¶ 32     Nonetheless, defendant argues in the alternative that the trial court abused its discretion in denying his motion to replace the public defender without sufficient inquiry and that we should remand for a hearing on his motion. Specifically, defendant complains that the court examined only the competency of appointed counsel and did not inquire into the relationship between appointed counsel and defendant. He emphasizes that, after the court denied his motion to replace the public defender, appointed counsel addressed the court and said that his relationship with defendant was "basically nonexistent" and that defendant "probably [didn't] trust a single thing" that counsel did or said. Even if counsel's comments to the court were somehow enough to require the court to conduct additional inquiry–and we are not at all convinced that they were–the error is not reversible unless defendant establishes that counsel was ineffective. See *People v. Ogurek*, 356 Ill. App. 3d 429, 434 (2005) (rejecting the defendant's argument based on federal case law that the trial court had a duty to inquire into the alleged attorney-client conflict and noting that the federal cases held that a trial court's failure to inquire is subject to harmless-error analysis and is not reversible absent ineffectiveness of counsel); *People v. Wanke*, 303 Ill. App. 3d 772, 783 (1999) ("The denial of a motion for the substitution of counsel will be upheld despite an abuse of discretion unless the defendant establishes that he was denied the effective assistance of counsel."). Accordingly, because we already concluded that defendant failed to establish that he was denied the effective assistance of counsel, defendant's argument that the trial court abused its discretion in not conducting further inquiry fails as well.

¶ 33     Defendant next contends that his convictions and sentences for counts XIII and XIV, armed violence against Pruneda, and count I, the attempted murder of Pruneda, violated the one-act, one-crime rule. Our supreme court set forth the one-act, one-crime doctrine in *People v. King*, 66 Ill. 2d 551 (1977), stating that a defendant suffers prejudice "where more than one offense is carved from the same physical act." *King*, 66 Ill. 2d at 566. A defendant also suffers prejudice, with respect to multiple acts, when he or she is "convicted of more than one offense, some of which are, by definition, lesser included offenses." *King*, 66 Ill. 2d at 566. Thus, "when more than one offense arises from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses, convictions with concurrent sentences can be entered." *King*, 66 Ill. 2d at 566. Analysis under the one-act, one-crime doctrine involves two steps: determining (1) whether the defendant's conduct involved a single act (in which case multiple convictions are improper) or multiple acts, and, (2) if multiple acts, whether any of the offenses were lesser included offenses (in which case multiple convictions are improper). *People v. Rodriguez*, 169 Ill. 2d 183, 186 (1996). Our review is *de novo*. *People v. Johnson*, 368 Ill. App. 3d 1146, 1163 (2006).

¶ 34     In his opening brief, defendant stated that "the separate injuries to Pruneda's face and ankles arguably constituted three separate physical acts." Therefore, defendant conceded that the first *King* prong was not violated. Defendant then argued that the armed-violence offenses were lesser included offenses of the attempted murder of Pruneda. Thus, defendant's argument was premised only on the second prong of *King*. The State responded by noting

defendant's concession of the first *King* prong and citing *People v. Crespo*, 203 Ill. 2d 335, 342 (2001), for the proposition that separate blows, even if closely related, constitute separate acts that can properly support multiple convictions. The State then argued that armed violence was not a lesser included offense of attempted murder. The parties agreed that the charging-instrument approach should be used for determining the lesser-included-offense issue. In his reply brief, defendant maintained that, pursuant to *Crespo*, 203 Ill. 2d at 345, multiple convictions based upon several physical acts cannot stand when the charging instrument treats the defendant's several acts as one single act. According to defendant, the indictment in the instant case treated his conduct as a single act. Defendant's argument in reply was based on *Crespo* and the first *King* prong. Defendant forfeited this argument by raising it for the first time in his reply brief. See *People v. Rodriguez-Chavez*, 405 Ill. App. 3d 872, 874-75 (2010).

¶ 35    Following briefing, we granted the State's motion to cite *People v. Miller*, 238 Ill. 2d 161 (2010), as additional authority. We then directed the parties to file supplemental briefs addressing *Miller*'s applicability to the present case. Specifically, we ordered the parties to consider *Miller*'s application to defendant's lesser-included-offense argument.

¶ 36    In *Miller*, the defendant was charged with and convicted of burglary, retail theft, and aggravated assault. *Miller*, 238 Ill. 2d at 163-64. The appellate court agreed with the defendant that retail theft was a lesser included offense of burglary and vacated his conviction of retail theft. *Miller*, 238 Ill. 2d at 164. The supreme court, however, reversed the appellate court, and affirmed the trial court, holding that both of the defendant's convictions could stand. *Miller*, 238 Ill. 2d at 176. The court noted that section 2–9(a) of the Criminal Code of 1961 (720 ILCS 5/2–9(a) (West 2006)) defines an included offense as one that is "established by proof of lesser facts or mental state, or both, than the charged offense." *Miller*, 238 Ill. 2d at 165-66. The court observed that the statutory definition provides little guidance as to the source to be examined in determining whether the definition is satisfied. *Miller*, 238 Ill. 2d at 166. The court noted that three possible methods had developed: the abstract-elements approach, the charging-instrument approach, and the factual or evidence-adduced-at-trial approach. *Miller*, 238 Ill. 2d at 166. The court held that, when the issue is whether one charged offense is a lesser included offense of another charged offense, the correct approach is the abstract-elements approach. *Miller*, 238 Ill. 2d at 173; *cf. People v. Novak*, 163 Ill. 2d 93, 112-14 (1994) (where the issue is whether an *uncharged* offense is a lesser included offense of a charged offense, the proper analysis is the charging-instrument approach). The holding in *Miller* applies to the instant case because the issue raised in each case is the same–whether one charged offense (here, armed violence in counts XIII and XIV) was a lesser included offense of another charged offense (here, attempted murder in count I).

¶ 37    In his supplemental brief, defendant argues that *Miller* is inapplicable because it is factually distinguishable in that the indictment in *Miller* separately charged a taking in the retail-theft count and an entering in the burglary count. See *Miller*, 238 Ill. 2d at 163. In the instant case, count I of the indictment alleged that defendant "performed a substantial step toward the commission of [first-degree murder] in that he, without lawful justification and with the intent to kill Matthew Pruneda, shot Matthew Pruneda with a firearm." Count XIII

alleged that "defendant while committing the offense of aggravated battery (great bodily harm) ***, personal [*sic*] discharged a firearm, a Category I weapon, that struck Matthew Pruneda in the left ankle." Count XIV alleged identical conduct, but referred to Pruneda's right ankle. Acknowledging that the armed-violence counts identified the particular injuries to which they referred, defendant argues that, because the attempted murder count did not specify a particular injury, the indictment here is different from that in *Miller* and *Miller* should therefore not apply. We disagree.

¶ 38   Initially we note that 17 of the 20 counts in the indictment in the present case expressly indicated a specific injury to a specific victim. We also note that the trial court merged counts XII and XV, the armed-violence counts expressly pertaining to the injury to Pruneda's face, into count I, the attempted-murder count pertaining to Pruneda, thus implicitly treating count I as pertaining to Pruneda's face. Therefore, *Miller* is not as factually distinguishable as defendant contends. Moreover, in requesting that we apply *Crespo* instead of *Miller*, defendant is conflating two distinct arguments. *Miller* expressly focused on the second *King* prong–whether one charged offense was a lesser included offense of another charged offense (*Miller*, 238 Ill. 2d at 165), while the issue in *Crespo* involved the first *King* prong–whether multiple convictions were based on a single physical act (*Crespo*, 203 Ill. 2d at 345). As noted above, the holding in *Miller* is directly applicable to this case. We directed the parties to file supplemental briefs to address *Miller*'s applicability to defendant's argument that his armed-violence convictions violated the one-act, one-crime rule because they were lesser included offenses of attempted murder. *Miller*'s applicability is not dependent upon *Crespo*, and defendant cannot now raise a new argument.

¶ 39   In any event, *Crespo* is not applicable to the present case. The issue in *Crespo* was whether the defendant's conviction of aggravated battery must be vacated because it stemmed from the same physical act as his conviction of armed violence. *Crespo*, 203 Ill. 2d at 340. There, the defendant stabbed the victim "three times in rapid succession," once in the right arm and twice in the left thigh. *Crespo*, 203 Ill. 2d at 338. The court acknowledged that each of the victim's three separate stab wounds could support a separate offense. *Crespo*, 203 Ill. 2d at 342. However, the court noted that in the indictment the State had not apportioned the two offenses among the various stab wounds and that it had presented its case under a theory that the defendant's conduct, though consisting of three separate stab wounds, constituted but a single attack on the victim. *Crespo*, 203 Ill. 2d at 343-44. Given those facts, the court held that it would be "profoundly unfair" to allow the State to change its theory on appeal. *Crespo*, 203 Ill. 2d at 343.

¶ 40   In his supplemental brief, defendant contends that *Crespo* essentially held that, to sustain multiple convictions, the State must indicate its intent to treat a defendant's conduct as separate acts. See *Crespo*, 203 Ill. 2d at 344. Defendant then argues that *Crespo* applies here because, although the State treated defendant's conduct as separate acts in the armed-violence counts, the State unfairly tried to "have it both ways" by simultaneously treating the multiple gunshots as one act for the purpose of proving the element of intent to kill in the attempted-murder count. In support of his position, defendant points to portions of the State's closing argument where it noted that defendant's firing multiple shots showed his intent to kill. Thus, according to defendant, the State's theory of the case at trial was that defendant's

conduct constituted a single act. We disagree.

¶ 41      That the State argued that defendant's intent to kill was established by his firing multiple shots does not reflect a theory of the case that the shots constituted a single act. Intent to kill is a state of mind that can be proved by the surrounding circumstances, including the character of the assault and the use of a deadly weapon. *People v. Mitchell*, 238 Ill. App. 3d 1055, 1061 (1992). Evidence of a defendant's firing a gun once would be sufficient to support the inference of intent to kill. *Mitchell*, 238 Ill. App. 3d at 1061 ("Notably, the act of firing a gun at someone supports the conclusion that the person shooting the gun acted with intent to kill the other person."). The State's reference to defendant's firing multiple shots supported its argument that each separate, additional act of firing the gun lent credence to the conclusion that defendant had the intent to kill. In other words, the State did not treat the multiple shots as a single act; rather, it treated them as multiple, separate acts showing a single element of attempted murder.

¶ 42      We also note that the State extensively questioned Pruneda about each of his individual injuries. The trial court found that the "shooting of Pruneda, Silva, and Diaz arose from a series of closely related acts," and defendant does not dispute this finding. As we observed above, 17 of the 20 counts in the indictment expressly indicated a specific injury to a specific victim. With respect to Pruneda, defendant committed three separate acts: he shot Pruneda in the face (supporting count I for attempted murder); he shot Pruneda in the left ankle (supporting count XIII for armed violence); and he shot Pruneda in the right ankle (supporting count XIV for armed violence). The indictment was sufficient to put defendant on notice that the State was treating defendant's infliction of each gunshot wound as a separate act, and the State's case was consistent with that theory. *Cf. Crespo*, 203 Ill. 2d at 343 (stating that it would be "profoundly unfair" to allow the State to apportion the offenses among the various wounds for the first time on appeal). Accordingly, *Crespo* is inapposite.

¶ 43      Having concluded that defendant's conduct constituted separate physical acts, we proceed to address the second *King* prong, whether the armed-violence offenses in counts XIII and XIV were lesser included offenses of the attempted murder in count I. Pursuant to *Miller*, we apply the abstract-elements approach to this question. *Miller*, 238 Ill. 2d at 175.

¶ 44      Our supreme court explained the abstract-elements approach:

>      "Under the abstract elements approach, a comparison is made of the statutory elements of the two offenses. If all of the elements of one offense are included within a second offense and the first offense contains no element not included in the second offense, the first offense is deemed a lesser-included offense of the second. [Citations.] *** In other words, it must be impossible to commit the greater offense without necessarily committing the lesser offense." *Miller*, 238 Ill. 2d at 166.

Here, we examine the statutory elements of armed violence and attempted murder. "A person commits armed violence when he or she personally discharges a firearm that is a Category I or Category II weapon while committing any felony defined by Illinois law," except for certain felonies not applicable here. 720 ILCS 5/33A–2(b) (West 2006). The predicate felony in counts XIII and XIV here was aggravated battery (great bodily harm) (720 ILCS 5/12–4(a) (West 2006)). "A person commits an attempt when, with intent to commit a specific offense,

-14-

he does any act which constitutes a substantial step toward the commission of that offense." 720 ILCS 5/8–4(a) (West 2006). "Attempted murder requires the State to prove that a defendant made a substantial step toward the commission of murder while possessing the intent to kill the victim." *People v. Sanchez*, 329 Ill. App. 3d 59, 68 (2002).

¶ 45 Not all of the elements of armed violence are included in the offense of attempted murder. Armed violence requires the defendant's personal discharge of a firearm that is a category I or II weapon, whereas attempted murder does not. Furthermore, armed violence predicated on aggravated battery under section 12–4(a) of the Criminal Code of 1961 requires the infliction of great bodily harm, while attempted murder does not. Because it is possible to commit attempted murder without necessarily committing armed violence, we hold that armed violence is not a lesser included offense of attempted murder. See *Miller*, 238 Ill. 2d at 176. Accordingly, defendant's convictions and sentences for armed violence did not violate the one-act, one-crime rule. See *Miller*, 238 Ill. 2d at 162-63 (noting the holding in *King* that "when the State charges a defendant with multiple offenses that arise 'from a series of incidental or closely related acts and the offenses are not, by definition, lesser included offenses' multiple convictions and sentences can be entered" (quoting *King*, 66 Ill. 2d at 566)).

¶ 46 We note that defendant concedes in his supplemental opening brief that armed violence is not a lesser included offense of attempted murder under the abstract-elements approach. Nonetheless, in arguing that the State should not have been allowed to "have it both ways," defendant asserts that it was particularly unfair in his case because his convictions resulted in consecutive, rather than concurrent, sentences. Although he cites language from *King* that concurrent sentences may be entered if the one-act, one-crime rule is not violated (see *King*, 66 Ill. 2d at 566), he cites no authority for the proposition that consecutive sentences were prohibited. The trial court imposed consecutive sentences on three of defendant's five convictions pursuant to the mandatory consecutive sentencing provision in section 5–8–4 of the Unified Code of Corrections (730 ILCS 5/5–8–4(a)(I) (West 2006)), which we address fully below. Suffice it to say that the trial court had no discretion with respect to the consecutive nature of those sentences. It appears that defendant is implicitly arguing that the provision is unconstitutional as applied to him, but he actually articulates no such argument. Indeed, in his supplemental brief, defendant concedes that, if we sustain the two convictions of armed violence on counts XIII and XIV (which we do), the State is correct that he is subject to resentencing under section 5–8–4.

¶ 47 Thus, we finally address the State's postbriefing motion to declare the sentences void because the trial court failed to properly impose mandatory consecutive sentences. Section 5–8–4 of the Unified Code of Corrections provides in relevant part: "The court shall impose consecutive sentences if: (I) one of the offenses for which defendant was convicted was first degree murder or a Class X or Class 1 felony and the defendant inflicted severe bodily injury ***." 730 ILCS 5/5–8–4(a)(I) (West 2006). When a defendant's convictions bring him within the purview of section 5–8–4, the mandatory sentencing requirement is triggered and consecutive sentences must be imposed. *People v. Curry*, 178 Ill. 2d 509, 520 (1997).

¶ 48 Here, defendant was convicted of three counts of attempted first-degree murder (counts I, II, and III), all of which were Class X felonies, and of two counts of armed violence (counts

-15-

XIII and XIV), both of which were Class X felonies. The trial court found that the injuries inflicted in counts I, II, and XIII constituted severe bodily injury. Therefore, section 5–8–4 was triggered, and the sentences on counts I, II, and XIII (the triggering offenses) were required to be consecutive to each other. See *Curry*, 178 Ill. 2d at 520. The trial court sentenced defendant to 26 years' imprisonment on count I, consecutive to a 20-year sentence of imprisonment on count XIII, consecutive to a 26-year sentence of imprisonment on count II. This was proper under section 5–8–4.

¶ 49     However, our supreme court has held that "section 5–8–4(a) must be construed so that any consecutive sentences imposed for triggering offenses be served prior to, and independent of, any sentences imposed for nontriggering offenses." *Curry*, 178 Ill. 2d at 539. Thus, while the sentences on counts III and XIV could be concurrent with each other, they could not begin to be served until defendant completed his consecutive sentences on the triggering offenses. The trial court sentenced defendant to 26 years' imprisonment and 20 years' imprisonment on counts III and XIV, respectively, both to run concurrently with the sentence on count I. This was not proper under section 5–8–4. See *Curry*, 178 Ill. 2d at 539. Accordingly, defendant's sentences are void. See *People v. Arna*, 168 Ill. 2d 107, 113 (1995) ("A sentence which does not conform to a statutory requirement is void.").

¶ 50     Although defendant's sentences are void, under the circumstances presented here, we need not remand to the trial court for a resentencing hearing. See *People v. Richmond*, 278 Ill. App. 3d 1042, 1048 (1996) (appellate court affirmed as modified, reinstating the trial court's original sentencing order where the new sentence imposed by the trial court on the defendant's postsentencing motion was void for failure to comply with the mandatory consecutive sentencing provision of section 5–8–4). In the instant case, the trial court imposed the minimum sentences on counts I, II, and III for attempted murder (6 years plus a mandatory 20-year add-on for personally discharging a firearm). See 720 ILCS 5/8–4(c)(1) (West 2006) (sentence for attempted first-degree murder is sentence for Class X felony); 730 ILCS 5/5–8–1(a)(3) (West 2006) (sentence for Class X felony is 6 to 30 years' imprisonment); 720 ILCS 5/8–4(c)(1)(C) (West 2006) (mandatory 20-year add-on for personally discharging a firearm while committing attempted first-degree murder). Moreover, under section 33A–3(b–5) of the Criminal Code of 1961, the court imposed the minimum sentences on counts XIII and XIV for armed violence (20 years). See 720 ILCS 5/33A–3(b–5) (West 2006) ("Violation of Section 33A–2(b) with a firearm that is a Category I or Category II weapon is a Class X felony for which the defendant shall be sentenced to a minimum term of imprisonment of 20 years."). Thus, the minimum aggregate sentence that defendant could receive is 98 years: 26 years (count I), plus 20 years (count XIII), plus 26 years (count II), plus 26 years (count III). (The sentence of 20 years on count XIV is concurrent with the sentence on count III). Accordingly, the trial court would have no discretion to impose a lesser number of years were we to remand for resentencing.

¶ 51     For the reasons given, we affirm defendant's convictions and reimpose the sentences entered by the trial court: 26 years on count I, 26 years on count II, 20 years on count XIII, 26 years on count III, and 20 years on count XIV. However, we further order that the sentences on counts I, II, and XIII run consecutively to each other and that the sentences on counts III and XIV run consecutively to the sentences imposed on counts I, II, and XIII (but

concurrently with each other).

¶ 52       Affirmed in part and vacated in part; sentences reimposed as modified.