# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 58405-1-II |
| Respondent, | |
| v. | UNPUBLISHED OPINION |
| SHAUN DUANE NORMAN, | |
| Appellant. | |

CHE, J. — Shaun Duane Norman appeals his conviction for attempting to elude a police vehicle and the imposition of a sentencing enhancement for endangering others.

The State charged Norman with attempting to elude a police vehicle. On the day before trial, the State moved to amend the information to add the sentencing enhancement that one or more persons were threatened with physical injury or harm by Norman's attempt to elude. A jury found Norman guilty and returned a special verdict that he endangered others, beyond himself and the pursuing police officer, during the commission of the crime.

Before sentencing, Norman sent two letters to the trial court requesting new counsel. At sentencing, the trial court acknowledged reviewing Norman's letters but summarily denied Norman's request for new counsel.

Norman argues that (1) the trial court violated Norman's constitutional rights in permitting the State to amend the information a day before trial, (2) insufficient evidence supported the endangerment enhancement, (3) Norman was denied effective assistance of

counsel, (4) the trial court violated Norman's constitutional right to counsel by failing to inquire into his attorney-client relationship before sentencing, and (5) cumulative error occurred. Norman also argues that the crime victim penalty assessment (VPA) and DNA fee on his judgment and sentence should be stricken.

We hold that (1) the trial court did not violate Norman's rights by allowing the amendment of the information before trial, (2) sufficient evidence supported the endangerment enhancement, (3) Norman's ineffective assistance of counsel claims fail, (4) the trial court did not violate Norman's constitutional right to counsel, and (5) Norman's cumulative error arguments fail. We also accept the State's concession that the VPA and DNA fee should be stricken from Norman's judgment and sentence.

## FACTS

*Background*

In March 2023, Washington State Patrol Trooper Kyle Schaar pulled his marked patrol vehicle onto the right shoulder of a two-lane, one direction freeway to look for a tan pickup truck with green canopy that was associated with a roadway incident. Norman was driving his tan truck in the left lane of the freeway when he passed Trooper Schaar traveling at a "high rate" "notably" above the normal flow of traffic.[1] Rep. of Proc. (RP) (May 23, 2023) at 56, 78.

Trooper Schaar pulled onto the freeway behind Norman and attempted to catch up and verify if Norman's truck matched the reported vehicle. When Trooper Schaar caught up with Norman, Norman had slowed down for traffic and there were two vehicles in front of Norman,

---

[1] In a stipulation read to the jury, Norman agreed he was the driver of the tan truck with green canopy.

one in each lane and nearly side-by-side. As Trooper Schaar activated his emergency lights, Norman moved partially into the right lane. Norman then drove between the two cars, "straddl[ing] the skip line -- the center line," and passed both vehicles. RP (May 23, 2023) at 59. The vehicle in the right lane moved out of the way to avoid a collision. Norman then increased his speed back to a "high rate."

Trooper Schaar disengaged from pursuit, turned off his emergency lights, and continued on the freeway at a slower speed. When Trooper Schaar gained authorization to resume the pursuit, he activated his emergency lights and siren and accelerated to over 100 miles per hour to catch up with Norman who was "many miles" ahead. RP (May 23, 2023) at 61. When Trooper Schaar caught up to Norman, Norman was driving below the speed limit at around 50 miles per hour in the left lane and with no traffic ahead of him. As Trooper Schaar followed behind Norman, Norman swerved to the right lane and back to the left lane. Trooper Schaar then observed Norman's truck "start[] to shake as if the driver was rapidly steering the vehicle back and forth." RP (May 23, 2023) at 62.

Trooper Schaar positioned his vehicle into the right lane and attempted a PIT maneuver on Norman's truck.[2] Norman's truck spun but was able to straighten out and continue driving down the freeway. Norman's truck slowed down further to roughly 20 miles per hour. When Trooper Schaar observed Norman swerving across the lanes again, Trooper Schaar attempted a second PIT maneuver. This maneuver was successful and Norman's truck came to a stop.[3]

---

[2] A PIT maneuver is a precision immobilization technique where an officer steers his vehicle into another's car, slightly behind one side's rear tire, so to force the car to turn and stop.

[3] Throughout the pursuit, there is no indication that Norman engaged his hazard lights or blinker.

*Procedural History*

In March 2023, the State charged Norman with attempting to elude a police vehicle. The trial court appointed Norman counsel and set trial for May 23, 2023.

Per the court clerk's minute entry, on May 15, the trial court held a pretrial hearing where the State moved to amend the information.[4] Norman was present with stand-in counsel. The State's motion and declaration said that the State "realize[d] that it had not added the enhancement of Endangering Another while Eluding Police. The Defendant is on video driving between two cars at high speed, forcing the vehicles to the shoulder." Clerk's Papers (CP) at 22. Norman's stand-in counsel requested that the trial court set over the motion one week for Norman's counsel to address it. The trial court granted the request to set over the motion to amend.

On May 22 the trial court heard the State's previously presented motion to amend the information. The State represented that Norman's counsel "knew about the amended information and it has been presented to the Court prior to today." RP (May 22, 2023) at 7. Norman's counsel provided no objection to the State's motion, and the trial court allowed the filing of the amended information. The amended information added the following facts to the allegation from the original information: "and furthermore one or more persons other than the Defendant or the pursuing law enforcement officer were threatened with physical injury or harm by the Defendant while Attempting to Elude." (Some capitalization omitted.) *Compare* CP at 1, *with* CP at 24.

---

[4] Norman did not request the report of proceedings for this hearing.

The court re-arraigned Norman on the amended information. Both parties confirmed they were ready for trial scheduled for the next day.

On May 23 the trial court heard the State's motion in limine to admit Trooper Schaar's dash cam footage extending beyond the second PIT maneuver, which the parties described to the trial court as including police directing Norman out of the truck with guns drawn, and Norman's arrest after walking away from police despite Trooper Schaar's commands to stop. Norman was present and his counsel argued the video was irrelevant and prejudicial while the State insisted the video was necessary to establish Norman's identity. The parties agreed to stipulate to Norman as the driver of the truck and the trial court limited the video to the footage leading up to and including the second PIT maneuver.

*Trial*

The matter then proceeded to a jury trial. Trooper Schaar testified consistently with the facts set out above. A copy of Trooper Schaar's dash camera footage, capturing the events starting with Trooper Schaar's initial pursuit to when Norman's truck stopped after the second PIT maneuver, was admitted into evidence without objection. Trooper Schaar testified additionally that driving too fast, driving between two vehicles on the freeway, and swerving across lanes was dangerous to others. Trooper Schaar further testified that driving too slow on the freeway can be dangerous because "traffic is expected to flow at a certain speed, . . . and driving too slow can cause a number of problems for drivers that are not expecting a car to be driving that slow." RP (May 23, 2023) at 79-80.

Norman testified he did not see Trooper Schaar or the activated lights behind him until Trooper Schaar initiated the first PIT maneuver. "It was bright out. The sun was pretty shiny."

and Norman testified he did not remember either driving between the two cars or weaving in and out of his lane. RP (May 23, 2023) at 83. Norman claimed he would have stopped if he had seen law enforcement attempting to stop him.

The jury found Norman guilty of attempting to elude a police vehicle. The jury also returned a special verdict that another person, other than Norman or a pursuing law enforcement officer, was threatened with physical injury or harm by Norman's actions during the commission of the crime.

Prior to sentencing, Norman sent two multipage letters to the trial court. CP at 42-52. In the May letter, Norman, among other things, stated:

> 4. . . . I was threatened that if I didn't take a deal more charges and special all[e]gation [e]nhan[ce]ments would be added. And in fact w[]ere added the day before trial.
>
> 5. Ins[uf]ficient Counsel [my counsel] failed to come see me in person file any motions or go over discovery of facts in this matter. She failed to show me video evidence until[]day of trial as I watched it with the jury I felt [e]mbar[r]es[sed], blin[d]ed and caught off guard. As she never came to see me in person and explain special al[le]gations [e]nhan[ce]ments. I was unable to make a well informed plea ar[r]ang[e]ment.

CP 45-46 (some capitalization omitted).

In the June letter, Norman, among other things, stated:

> I would like to fire [my counsel] for ins[uffici]ent coun[sel]. As she was at less th[a]n half of my court dates. She never came to see me one time and never once answered the phone when I tried to call. She never went over the discovery or showed me any of the video ev[ide]nce. She never called any witnesses or held any evidence I asked for. She failed to protect my []rights. As I felt bullied to take a plea and threatened that if I did not I would have more charges filed and a special al[le]gations in har[r]as[s]ment added. She did not file one motion on my behalf and failed to make a case in this matter. She didn't even tr[y].
>
> I asked [my counsel] to hold my ve[]hicle in ev[i]dence and call my psycho[logi]st as a c[h]aracter witness. As well as the nurse that drew my blood.

6

[My counsel] didn't even tr[y] my case on the day of trial she had an intern do my trial.

5. The []right to ad[equa]te coun[sel] [my counsel] has in my [opinion] to[o] many cases on her case load and was unable to spend the time needed on my case. As she was only present in half of my court pro[cee]dings and failed to present any motions or go over my discovery with me as well as show me the video evidence[] until[] the day of trial and I feel I couldn't make a proper deci[sion] to plea my case.

I also feel I was threatened to make a plea deal or special allegation [en]han[ce]ments would be added."

CP at 49-51 (some capitalization omitted).

At the sentencing hearing, Norman's counsel notified the trial court that Norman wanted to address the court and not have his counsel address sentencing. The trial court responded, "I have read [Norman's] written request and his request for new counsel is denied." RP (Jun. 12, 2023) at 9. Norman's counsel then requested to set over sentencing explaining, "I talked with [] Norman multiple times before today's hearing. I was not able to get the information that I needed to prepare with a sentencing brief. I can -- he did not want to talk with me further." RP (Jun. 12, 2023) at 9. The trial court denied this request as well. Norman's counsel requested the low end of the standard sentencing range due to Norman's lack of criminal history. During Norman's allocution, the following exchange occurred:

> NORMAN: Yes, Your Honor. Your Honor, I was asking if I could have a waiver for the special allegation enhancement.
>
> THE COURT: Is that all?
>
> NORMAN: Yeah, and . . . I have a speech made out, but . . . I wanted to talk to another lawyer with my appeal.
>
> THE COURT: Well, we . . . are going to complete your sentencing hearing today with [your counsel] acting as your attorney. If you want a different attorney to help you with your appeal, that matter will be addressed at a later time.

7

NORMAN: . . . I believe that [my counsel] was insufficient counsel.

THE COURT: I have already read that. I have denied your request for a new attorney. What - - what you are reading to me right now, I already have a copy of it and I have read it more than once and I - - and I do not agree with you that you didn't receive adequate counsel.

NORMAN: I - - she did not - -

THE COURT: Mr. Norman. Mr. Norman, please listen to me. It is my decision that you were effectively represented at trial. And I am denying your request for a new attorney.

RP (Jun. 12, 2023) at 10-11.

The trial court sentenced Norman to eight months of confinement and imposed a $500 crime VPA and $100 DNA fee.[5] The trial court found Norman indigent as defined in RCW 10.101.010(3)(a)-(c).

ANALYSIS

Norman argues that (1) the trial court violated Norman's constitutional right to notice in permitting the State to amend the information a day before trial, (2) insufficient evidence supported the endangerment enhancement, (3) Norman was denied effective assistance of counsel, (4) the trial court violated Norman's constitutional right to counsel by failing to inquire into his attorney-client relationship before sentencing, (5) cumulative error occurred from these alleged errors, and (6) the VPA and DNA fees on Norman's judgment and sentence should be

---

[5] The standard range was 12 months plus a day to 14 months plus a day. The State requested 14 months. The sentence imposed represented a downward departure from the standard sentencing range. Although the trial court did not enter findings in support of the exceptional sentence, the State does not cross appeal Norman's sentence and so we do not address it.

stricken. We affirm Norman's conviction but remand to strike the VPA and DNA fees from Norman's judgment and sentence.

## I. AMENDED INFORMATION

Norman argues that the trial court violated Norman's rights by allowing the State to amend the information the day before trial. We disagree.

We review a trial court's decision to allow the State to amend the information for an abuse of discretion. *State v. Ziegler*, 138 Wn. App. 804, 808, 158 P.3d 647 (2007).

Under article 1, section 22 of the Washington Constitution, a defendant has a constitutional right to be "adequately informed of the charge to be met at trial."[6] *Id.*; *see also State v. Schaffer*, 120 Wn.2d 616, 619-20, 845 P.2d 281 (1993). The criminal court rules, tempered by the Constitution, permit a trial court to allow the amendment of "any information . . . any time before verdict or finding" so long as the "substantial rights of the defendant are not prejudiced." CrR 2.1(d); *Ziegler*, 138 Wn. App. at 808, n.3. If an information is amended after the State has rested its case in chief and the amendment is not to a lesser degree of the same charge or a lesser included offense, it is reversible error per se. *Ziegler*, 138 Wn. App. at 809 (citing *State v. Pelkey*, 109 Wn.2d 484, 745 P.2d 854 (1987)). However, when the "*Pelkey* rule" does not apply, the defendant must demonstrate prejudice resulting from the amendment. *Ziegler*, 138 Wn. App. at 809-10.

The amendment in Norman's case occurred before trial and so Norman must demonstrate that prejudice resulted from the amendment. *See id.*

---

[6] Article I, section 22 of the Washington State Constitution guarantees criminal defendants "shall have the right . . . to demand the nature and cause of the accusation against [them]".

Norman relies on part of this court's decision in *Ziegler* but the unmentioned parts are instructive. *Ziegler* involved three midtrial amendments made after two witnesses testified in the State's case in chief. *Id. at* 807. One amendment changed a charge of child rape to child molestation involving one child. *Id.* The other amendments added two child rape charges involving another child. *Id.* Our court reversed on the two amendments adding the child rape counts reasoning:

> This was not merely the amendment from one crime to a similar charge. Nor was this an amendment that changed the means of a crime already charged. Adding two child rape charges during trial affected Ziegler's ability to prepare his defense. His trial strategy and plea negotiations with the State would likely have been different had he known there would be two additional child rape charges. The addition of two child rape charges was a violation of Ziegler's [sic] right to know of and defend against the State's charges.

*Id.* at 811. However, our court affirmed the midtrial amendment from changing a child rape charge to one for child molestation. *Id.* at 810. In our reasoning, we noted how Ziegler's attorney had access to discovery related to the factual basis of the amended charge.[7] *Id.* We additionally noted how Ziegler had failed to request a continuance when the charge was amended. *Id.* Under those facts, we held that Ziegler failed to meet his burden of showing prejudice. *Id.*

Here, the amended information did not add or modify the crime charged but added the endangerment sentencing enhancement allegation. Unlike the timing of the amendments in *Ziegler*, the State moved to amend the information over a week before trial. Norman would have

---

[7] The critical difference between the two charges was whether a certain type of contact occurred and Ziegler's attorney interviewed the victims as well as had access to police reports detailing the contacts. *Ziegler*, 138 Wn. App. at 810.

been rearraigned on the amended charge at the hearing over a week before trial but for the fact that Norman's stand-in counsel wanted Norman's counsel to address the rearraignment.

Later, when the trial court heard the motion to amend, the State represented that Norman's counsel had known about the amendment. Norman's counsel did not deny previously knowing of the amendment and made no objection to the amendment. Additionally, right after the trial court granted the motion to amend, Norman's counsel confirmed that they were ready for trial the next day. While Norman did not say when he knew about the possibility of the State seeking to amend the charge, Norman acknowledged in letters to the court that he felt he was being "threatened" with the addition of a sentencing enhancement if he went to trial. CP at 45, 49.

Norman asserts that the amendment prejudiced his case because he was unaware of the contents of the dash cam video recording and, thus, was unable "to assess the prejudicial effect of the video or make a realistic assessment of the risk he faced" from the video. Br. of Appellant at 20. However, Norman fails to explain exactly how his personal unawareness of the dash cam's content was caused by the amendment or how exactly the addition of the enhancement affected his ability to prepare his defense. *Cf. Ziegler*¸ 138 Wn. App. at 811 (explaining that part of how Ziegler was prejudiced by the added child rape charges was because "[h]is trial strategy and plea negotiations with the State would likely have been different had he known there would be two additional child rape charges"). The probable cause statement mentioned that Trooper Schaar's vehicle had audio/video recording equipment. Norman was present at the earlier hearing when the State first moved to add the enhancement. The record indicates that Norman's counsel knew of the motion to amend before the set over hearing date, and, despite the written

motion specifically mentioning the dash cam footage, Norman's counsel made no objection to the motion.

Additionally, it is unclear how additional discovery or a continuance when the information was amended would have helped Norman's defense or how Norman's trial strategy or plea negotiations would have differed due to the addition of the enhancement, particularly because Norman knew of the potential enhancement prior to the amendment and trial. *See id.* at 810-11. With the amendment occurring before trial, Norman still had time to negotiate with the State if he wished or to coordinate trial strategy with his attorney. The next day, in a motion in limine hearing before trial, Norman counsel successfully argued to limit the admission of the dash cam video recording to certain portions.

We hold that Norman fails to meet his burden of showing prejudice resulting from the amendment itself and hold that the trial court did not abuse its discretion in allowing the addition of the endangerment enhancement allegation before trial.

II. SUFFICIENCY OF EVIDENCE FOR ENDANGERMENT SENTENCING ENHANCEMENT

Norman argues the State failed to present sufficient evidence to support the jury's special verdict that Norman endangered others, separate from himself or the pursuing officer, while attempting to elude the police. We disagree.

Evidence is sufficient to support a conviction if, upon viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the charged crime's elements proven beyond a reasonable doubt. *State v. Houser*, 30 Wn. App. 2d 235, 270-71, 544 P.3d 564 (2024), *review denied*, 3 Wn.3d 1015 (2024); *see also State v. Cardenas-Flores*, 189 Wn.2d 243, 265, 401 P.3d 19 (2017). When a defendant brings a sufficiency of the evidence

claim, he admits the truth of the State's evidence, and we construe all reasonable inferences in favor of the State. *Id.* at 271.

In attempting to elude a police vehicle[8] cases, the State may file a special allegation of endangerment when sufficient evidence exists to show that one or more persons, other than the defendant or the pursuing law enforcement officer, were threatened with physical injury or harm by the actions of the person committing the attempting to elude a police vehicle. RCW 9.94A.834(1). The State must prove beyond a reasonable doubt that the defendant committed the crime while endangering one or more persons other than the defendant or the pursuing law enforcement officer. RCW 9.94A.834(2).

In viewing the evidence in the light most favorable to the State, the State presented sufficient evidence for a rational trier of fact to conclude beyond a reasonable doubt that Norman drove in a manner that threatened others with physical injury or harm beyond Trooper Schaar and himself. When Trooper Schaar first observed Norman, Norman was traveling at a "high rate" of speed along the freeway. When Trooper Schaar caught up to Norman, two other cars were driving right in front of Norman, one in each lane of the freeway.

As Trooper Schaar activated his patrol vehicle's lights, Norman drove between the two cars, straddling the skip line between the two lanes and causing at least one of the vehicles to

---

[8] Attempting to elude a police vehicle is defined as any driver of a motor vehicle who willfully fails or refuses to bring their vehicle to a stop and who drives their vehicle in a reckless manner while attempting to elude a pursuing police vehicle, after being given an audible or visible signal to stop by a uniformed police officer in a vehicle equipped with lights and sirens. RCW 46.61.024(1). It is an affirmative defense, which must be established by a preponderance of the evidence, if a reasonable person would not believe that the signal to stop was given by a police officer and driving after the signal to stop was reasonable under the circumstances. RCW 46.61.024(2).

veer out of its lane to avoid Norman's truck colliding with it. Norman then increased his speed back to a "high rate," and after reengaging pursuit, Trooper Schaar noted Norman's speed had decreased significantly. Trooper Schaar testified that traveling too fast, too slow, swerving within a lane, or swerving across lanes can be dangerous.

From this evidence, a rational jury could have reasonably inferred that Norman's actions, while eluding Trooper Schaar's vehicle, endangered the physical safety of the two other drivers on the freeway.[9] Thus, we hold that sufficient evidence supported the sentencing enhancement. *See Houser*, 30 Wn. App. 2d at 270-71.

### III. INEFFECTIVE ASSISTANCE OF COUNSEL

Norman argues that he was denied his right to effective assistance of counsel. First, Norman contends that his counsel provided ineffective assistance by failing to review the dash cam footage with him prior to trial. Second, Norman claims that his counsel failed to interview potential witnesses and investigate Norman's claim that the truck was out of gas when stopped by Trooper Schaar. Finally, Norman states that his counsel failed to pursue the defense that Norman had run out of gas, was coasting in neutral, and was unable to pull over when Trooper Schaar stopped his truck. We disagree that Norman's counsel was constitutionally ineffective.

Both the Sixth Amendment to the United States Constitution and article 1, section 22 of the Washington Constitution guarantee defendants effective assistance of counsel. *State v.*

---

[9] Norman contends that this conduct was nevertheless insufficient because "there was no evidence of any loss of control over [] Norman's vehicle or that there was actually a danger of him crashing into other cars or that he created a risk of harm that differed in any way from the ordinary harm incident to driving recklessly that is required to prove the charge of eluding." Br. of Appellant at 15. However, Norman cites no authorities requiring such and, additionally, the jury could have reasonably inferred from the evidence that the State proved the enhancement's elements beyond a reasonable doubt. *See Houser*, 30 Wn. App. 2d at 271.

14

*Grier*, 171 Wn.2d 17, 32, 246 P.3d 1260 (2011). However, we give "great deference to trial counsel's performance and begin[] the analysis with a strong presumption that counsel was effective." *State v. Crow*, 8 Wn. App. 2d 480, 507, 438 P.3d 541 (2019).

To demonstrate that counsel's performance was constitutionally ineffective, a defendant must show that counsel performed deficiently and that the deficient performance prejudiced the defense. *State v. Cienfuegos*, 144 Wn.2d 222, 227, 25 P.3d 1011 (2001). A defendant demonstrates deficient performance by showing that counsel's performance "fell below an objective standard of reasonableness based on consideration of all the circumstances." *Crow*, 8 Wn. App. 2d at 507.

"The presumption of reasonableness may be rebutted when a criminal defendant demonstrates 'an absence of any legitimate trial tactic that would explain counsel's performance.'" *State v. K.A.B.*, 14 Wn. App. 2d. 677, 707, 475 P.3d 216 (2020) (quoting *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d 90 (2017)). "'[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* at 707 (quoting *Lui*, 188 Wn.2d at 539). And even strategic decisions made after incomplete investigation are reasonable so long as professional judgments support the investigation's limitations. *Id.* at 707.

If a defendant shows that counsel's performance was deficient, we next consider whether that deficient performance caused the defendant prejudice. *State v. Lopez*, 190 Wn.2d 104, 116, 410 P.3d 1117 (2018). A defendant demonstrates prejudice by showing that "there is a reasonable probability that the outcome would have been different" but for counsel's deficient performance. *Cienfuegos*, 144 Wn.2d at 227. A "reasonable probability" exists if the probability

15

is sufficient to undermine our confidence in the outcome. *Lopez*, 190 Wn.2d at 116. Because a defendant must establish both deficient performance and prejudicial effect, our inquiry ends if the defendant fails to show either deficient performance or prejudice. *State v. Case*, 13 Wn. App. 2d 657, 673, 466 P.3d 799 (2020).

First, Norman argues that his counsel provided ineffective assistance by failing to review the dash camera recording with him prior to trial. However, even assuming without deciding that this allegation is true, Norman fails to explain how his counsel's failure to review the recording with him before trial specifically prejudiced the outcome of his case. At most, in another section of Norman's brief related to the amended information, Norman broadly states that he was unable to assess the prejudicial effect of the video or make realistic assessment of his risk when the video was viewed by the jury.

While Norman may have not seen the video until it was shown for the jury, he does not appear to claim he did not know that there was a video. Further, Norman does not explain how watching the video beforehand would have created a reasonable probability that the outcome would have been different, particularly coupled with the facts that he had stipulated to being the driver and he notified the court that he felt "threatened" and "bullied to take a plea [deal]," which he did not take. CP at 45, 49; *Cienfuegos*, 144 Wn.2d at 227.

Because Norman fails to demonstrate prejudicial effect, we hold that his first ineffective assistance of counsel claim fails. *See Case*, 13 Wn. App. 2d at 673.

Norman's remaining two arguments center principally on an argument that his counsel performed deficiently by failing to conduct a reasonable investigation. Norman contends that his counsel's investigation was insufficient because his counsel failed to call Norman's psychologist

16

as a character witness, call "the nurse who conducted [his] blood draw," or hold his vehicle in evidence after he asked counsel to do so. Br. of Appellant at 24. Additionally, Norman argues that his counsel failed to investigate Norman's version of events that he had or was nearing running out of gas, was trying to restart his truck, and was coasting in neutral when Trooper Schaar initiated his first PIT maneuver.

Even assuming without deciding that Norman's factual allegations here are true, Norman fails to overcome the presumption that counsel performed reasonably for each of these arguments because he fails to explain how Norman's counsel's investigation was not supported by reasonable, professional judgment. *K.A.B.*, 14 Wn. App. 2d. at 707. While our courts have recognized that reasonable investigation includes "expert assistance necessary to an adequate defense," Norman argues that his psychologist should have been called, not to provide expertise, but to be a character witness for Norman. *See Lopez*, 190 Wn.2d at 116 (quoting *State v. Punsalan*, 156 Wn.2d 875, 878, 133 P.3d 934 (2006)).

But Norman's driving, not character, was in controversy here, and Norman fails to explain, if such evidence was even admissible, how it would have aided his defense. *See* ER 404-406. Norman provides no argument nor points us to the record explaining what evidence his psychologist would have provided and how such evidence would have helped Norman's defense in attempting to elude a police vehicle, particularly when his defense was that he was unaware of the police officer and their lights and sirens.

Similarly, while Norman contends that a nurse who drew his blood should have been called, "[a] decision not to call a witness is a matter of trial tactics," and Norman fails to explain how Norman's counsel's decision not to call such a witness was anything but legitimate trial

strategy. *See State v. Krause,* 82 Wn. App. 688, 697-98, 919 P.2d 123 (1996) ("A decision not to call a witness is a matter of trial tactics that generally will not support a claim of ineffective assistance of counsel."). No one at trial contended the Norman was impaired in anyway while driving his truck. It is unclear how a nurse who drew Norman's blood would have been relevant to the proceedings.

Finally, Norman fails to show how his counsel's decision to not hold his truck in evidence or investigate Norman's contention that he did not stop because he was running out of gas was not reasonable trial strategy and, instead, exceeded professional judgment. *K.A.B.*, 14 Wn. App. 2d. at 707. Even if the truck would have shown that Norman was running out of gas, it is reasonable that his counsel declined to present or investigate further that defense because it is unclear how such facts would have provided a plausible option in defending Norman.

Additionally, such evidence would not have explained Norman straddling the skip line between two cars while Trooper Schaar had activated his lights, or later, why Norman was weaving in the roadway and failing to stop despite Trooper Schaar's sirens and lights. If a reasonable driver of a car was running out of gas, they would pull over or at least engage their hazard lights or a turn signal to notify others of the emergency, not weave from the left lane, fully into the right lane, and then fully back into the left lane. Further, it is unclear how preservation of the truck would have supported Norman's general denial or one of the statute's affirmative defenses. *See* RCW 46.61.024(2).

Norman fails to overcome the strong presumption that his counsel acted reasonably and show that his counsel's decision to not preserve the truck was made without reasonable, professional judgment. *See Crow*, 8 Wn. App. 2d at 507; *see also K.A.B.*, 14 Wn. App. 2d. at

18

707. With Norman failing to either overcome the strong presumption of effective performance or show deficient performance and prejudice, we hold that Norman's ineffective assistance of counsel claims fail.

## IV. RIGHT TO COUNSEL

Norman argues that the trial court infringed on Norman's right to counsel by failing to inquire into potential breakdown of Norman's attorney-client relationship when Norman requested the appointment of new counsel at sentencing. We disagree.

We generally review a trial court's decision relating to conflicts between clients and their attorneys for abuse of discretion. *State v. Cross,* 156 Wn.2d 580, 607, 132 P.3d 80 (2006), *abrogated on other grounds by*, *State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018); *see also State v. Varga*, 151 Wn.2d 179, 200, 86 P.3d 139 (2004).

When a trial court learns of a conflict between the defendant and their counsel, the trial court has "an 'obligation to inquire thoroughly into the factual basis of the defendant's dissatisfaction' sufficient to reach an informed decision." *State v. Davis*, 3 Wn. App. 2d 763, 790, 418 P.3d 199 (2018) (quoting *State v. Thompson*, 169 Wn. App. 436, 462, 290 P.3d 996 (2012)). The inquiry must be "meaningful" and include a "full airing" of the defendant's concerns. *Cross*, 156 Wn.2d at 610.

However, "[f]ormal inquiry is not always essential where the defendant otherwise states his reasons for dissatisfaction on the record." *State v. Schaller*, 143 Wn. App. 258, 271, 177 P.3d 1139 (2007); *see State v. Holmes*, 31 Wn. App. 2d 269, 284, 548 P.3d 570, *review denied*, 3 Wn.3d 1024 (2024); *see also State v. Lopez*, 79 Wn. App. 755, 766, 904 P.2d 1179 (1995), *disapproved on other grounds by*, *State v. Adel*, 136 Wn.2d 629, 965 P.2d 1072 (1998) ("Unless

a substitution motion . . . is extremely detailed . . . a court cannot make such a determination without conducting a proper hearing.").

Here, after trial but prior to sentencing, Norman sent the trial court two multiple-paged letters that each outlined the reasons why Norman believed his counsel's performance was deficient and provided those reasons as a basis for his request for new counsel. In listing various rights Norman argued were infringed upon, Norman dedicated multiple paragraphs in each letter to explain his reasons for believing his counsel was ineffective and wanting to fire her. The trial court acknowledged reading these letters "more than once" and denied his request. RP (Jun. 12, 2023) at 11.

Norman relies on *State v. Cross,* 156 Wn.2d 580, 132 P.3d 80 (2006), and *United States v. Adelzo-Gonzalez*, 268 F.3d 772, 268 F.3d 772 (9th Cir. 2001), in arguing that the trial court should have asked specific and targeted questions instead so to encourage Norman to fully air his concerns. However, *Cross* does not support such a proposition as it merely held that a trial court's repeated inquiry demonstrated that its inquiry was meaningful and full. 156 Wn.2d at 610.

The Ninth Circuit in *Adelzo-Gonzalez* held certain inquiries of a district court following a defendant submitting letters requesting substitution were inadequate holding that "[t]he district court asked only open-ended questions and put the onus on defendant to articulate why the appointed counsel could not provide competent representation." 268 F.3d at 777. But, the court noted that its review of the adequacy of the trial court's inquiry was limited due to Adelzo-Gonzalez's letters not appearing on the appeal record nor their contents recited on the record. *Id*. Additionally, the court noted that its holding was case-specific. *See id.* at 777-78 ("While open-

20

ended questions are not always inadequate, in most circumstances a court can only ascertain the extent of a breakdown in communication by asking specific and targeted questions.").

Unlike the letters in *Adelzo-Gonzalez*, Norman's letters were made a part of the record on appeal and, thus, we can evaluate their contents and discern that, given the content of Norman's letters, the trial court here was sufficiently informed so to not require additional, formal inquiry. Additionally, Norman's complaints and requests for new counsel came only after the jury's verdict. The appeal record is silent as to any instance of Norman's discontent with counsel prior to Norman's letters sent only after the jury's verdict. Notably, Norman's counsel did not indicate that she also thought there were any representation issues beyond her client suddenly not talking to her when she tried to prepare for sentencing.

Generally, when a defendant raises concerns about their counsel, trial courts should inquire into the reasons for the request and the extent of the conflict in order to ensure the court is well informed in making its decision. However, we hold that, under the circumstances here where the trial court was well informed of Norman's reasons for seeking new counsel, the trial court did not abuse its discretion in not inquiring further.

## X. CUMULATIVE ERROR

Norman argues that the cumulative error doctrine requires reversal of his conviction and enhancement because of his counsel's alleged deficient performance and the trial court permitted the amendment to the information adding the endangerment enhancement. We disagree.

Cumulative error applies when a combination of trial errors denies the accused of a fair trial, "'even where any one of the errors, taken individually, would be harmless.'" *State v. Azevedo*, 31 Wn. App. 2d 70, 85, 547 P.3d 287 (2024) (quoting *In re Pers. Restraint of Cross*,

21

180 Wn.2d 664, 690, 327 P.3d 660 (2014)). Reversal is required if, under the totality of the circumstances, a defendant shows that the accumulation of errors substantially prejudiced them and denied them a fair trial. *Azevedo*, 31 Wn. App. 2d at 85.

Here, Norman fails to show that his counsel performed deficiently by allegedly failing to interview certain potential witnesses, investigate Norman's claim that the truck was out of gas when stopped by Trooper Schaar, and pursue a defense that Norman had run out of gas and, thus, was unable to pull over for the trooper. Even assuming without deciding that error occurred with Norman's two remaining alleged errors—the amendment to the information and Norman's counsel's failure to review the dash cam footage with him—, Norman fails to show under the totality of circumstances, that these two errors substantially prejudiced him and denied him a fair trial. Thus, reversal is not warranted under the cumulative error doctrine.

## XI. VPA AND DNA COLLECTION FEE

Norman argues that, due to a recent amendment to the statutes governing LFOs, we should remand for the trial court to strike its imposition of a VPA and DNA collection fee in Norman's judgment and sentence. The State agrees that the VPA and DNA collection fee should be stricken on remand. We accept the State's concessions.

At sentencing, the trial court found Norman indigent as defined in RCW 10.101.010(3)(a)-(c). And, as a part of Norman's judgment and sentence, the trial court ordered Norman to pay a $500 VPA and a $100 DNA collection fee.

Due to a recent amendment to the statute governing the VPA, this LFO can no longer be imposed on defendants found indigent as defined in RCW 10.01.160(3) at the time of sentencing. RCW 7.68.035(4); LAWS OF 2023, ch. 449, § 1; *State v. Ellis*, 27 Wn. App. 2d 1, 16, 530 P.3d

No. 58405-1-II

1048 (2023), *review granted*, 4 Wn.3d 1009 (2025). Additionally, the DNA collection fee is no longer authorized by statute. LAWS OF 2023, ch. 449, § 4; *Ellis*, 27 Wn. App. 2d at 17. Both changes apply to cases on direct appeal, such as Norman's. *See Ellis*, 27 Wn. App. 2d at 16.

Because neither the DNA collection fee is no longer authorized and Norman qualified for waiver of the VPA, we remand to the trial court to strike both LFOs from his judgment and sentence.

CONCLUSION

We affirm Norman's conviction but remand to strike the VPA and DNA fee.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Che, J.

We concur:

Cruser, C.J.

Veljacic, J.

23